## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

Barbara Sobel, individually and on behalf of
all others similarly situated,

1:21-cv-04992

                                        Plaintiff,

                - against -                               Class Action Complaint

Molekule, Inc.,                                          Jury Trial Demanded

                                        Defendant

     Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff,

which are based on personal knowledge:

     1.     Molekule, Inc. ("defendant") manufactures, packages, labels, markets, and sells air

purifiers – Air (pictured below), Air Pro, Air Mini and Air Mini+ under the Molekule brand

("Products").



2.      The Products are based on Photo Electrochemical Oxidation ("PECO") technology as opposed to HEPA, or High Efficiency Particulate Air.

3.      Defendant markets the Product through social media, its website, digital, and/or print media.

4.      Defendant's main selling point is its reliance on its PECO technology, which it contends are useful against chemicals, microbes, allergens, and other forms of air pollution.

5.      Located in San Francisco, defendant has raised almost $100 million in venture capital.

6.      Whereas most air purifiers were bulky and had loud fans, defendant's design is:

> unlike anything on the purifier market: a slender two-foot-tall cylinder with sharp edges on top and a buttery-soft handle made of vegan leather that complemented the MacBook-silver casing. It was a device that would be at home in an Apple Store and sell well in a home-goods shop in Greenpoint.[1]

7.      According to New York Magazine:

> The brand was perfectly tailored to a certain type of consumer: It had groundbreaking technological claims, haute design, and a pile of VC cash to spend on Instagram ads. The company's press team pitched tech sites and "high-value, low-risk targets": Goop and parenting blogs. Molekule made an appearance at South by Southwest and got the MoMA Design Store to carry the device. In 2017, Time put Molekule on a list of the year's best inventions, alongside the fidget spinner.

8.      However, the Molekule products were found to be ineffective in purifying air by The Wirecutter, a popular consumer electronics review website.

9.      Consumer Reports ranked Molekule as the third lowest in a 2019 test of 48 air

---

[1] Reeves Wiedeman, The Magic Molekule There has never been a better business (or planetary) climate in which to calm and stoke your anxieties about dirty air, New York Magazine, Mar. 16, 2021.

purifiers.

10.    In 2019, the National Advertising Division ("NAD") section of the Better Business Bureau ("BBB") determined that defendant's claims related to (1) quantified pollution removal, (2) superiority of PECO compared to HEPA, and (3) allergy and asthma relief, were without support.

11.    NAD's findings were almost all upheld on appeal in 2020.

12.    For years prior to NAD's findings and report, defendant saturated social and digital media with its advertisements and claims.

13.    Though defendant agreed to remove and modify certain claims as a result of the NAD proceeding, the pervasive nature of the claims ensured consumers would rely on false, deceptive, and misleading claims when seeking to purchase an air purifier.

## I.    QUANTIFIED POLLUTION REMOVAL CLAIMS

14.    Defendant makes numerous quantified pollution claims, in its digital and social media marketing, and on its website, promising to destroy an absolute number or percentage of pollutants:

- "Molekule is different. Our PECO technology completely destroys all pollutants, instead of just collecting a few of them . . . Allergens, mold, bacteria, VOCs, and viruses are all completely eliminated by Molekule."

- "Molekule's revolutionary nanotechnology destroys pollutants at the molecular level."

- "Destroys 3.4 million black mold spores in 50 minutes"

- "Destroys 1 million allergens in 4 minutes"

- "Destroys 3.4 million ms2 viruses in 2 minutes"

- "Destroys 3.7 million bacteria in 5 minutes"

- "Molekule's patented technology, Photo Electrochemical Oxidation (PECO), works at the molecular level to eliminate indoor air pollution."

- "Molekule breaks down even the smallest bacteria before they have a chance to accumulate."

- "Because nothing is collected during the Molekule process, mold is quickly and permanently removed from the air."

- "While the Pre-Filter will catch the larger dust particles in the air, PECO will break down even the smallest allergens, like pollen, dust mites, and dander to provide truly allergen free air."

- "Form, meet function. Welcome to a whole new air purification experience— unobtrusive, portable, and 100% effective. From the inside out, Molekule has reimagined what clean air ought to look and feel like."

- "Made for large rooms. Molekule is able to completely replace the air in a 600 square foot room (large living room) once an hour. Its 360° air intake pulls in pollutants from all sides, projecting clean air evenly across the entire room."

- "Molekule introduces a brand new patented air purification technology today, which uses nanotechnology to completely eliminate the full spectrum of indoor pollutants."

- "Independent testing shows the Molekule Home One reduces concentrations of formaldehyde, toluene, and D-limonene to undetectable levels after a short time in a sealed chamber."

- "Independent testing reveals Molekule's PECO Technology successfully destroys

4

mold, bacteria and viruses."

- "Independent testing shows PECO Technology outperforms carbon filters and reduces VOCs to undetectable levels in just 90 Minutes."

15. These claims are false, deceptive, and misleading for various reasons.

16. Whereas HEPA filters are generally defined as capturing 99.97% of airborne particles measuring microns in size, defendant's Product claim to eliminate or destroy 100% of indoor pollutants.

17. However, defendant's testing does not substantiate its pollution elimination claims and its testing is not independent.

18. The evidence in support of these claims is insufficient to show the Product will eliminate all pollutants, such as bioaerosols and VOCs, from a room's air.

A. Bioaerosol Elimination Claims

19. To substantiate its bioaerosol elimination claims, defendant failed to test the device itself, as marketed for sale, in a consumer relevant environment.

20. Defendant offered a single study in support of its bioaerosol elimination claims, which was not even a device marketed for sale to consumers, but a prototype disinfection unit.

21. The test chamber was far smaller than the typical living space where the Molekule device would actually be used.

22. The device was not tested under consumer relevant conditions in that the challenge aerosols were introduced directly into the test device (i.e., as a "single-pass" test).

23. Consumer relevant conditions would have required the challenge aerosols to be introduced into a larger surrounding chamber as part of a "recirculating test" to assess the ability of the Product to clean pollutants from the air of a room-sized chamber.

24.     Therefore, the test's results do not accurately reflect the actual marketed Product's effectiveness at removing pollutants as typically present in an actual entire room.

25.     Even under the tested conditions, the results did not show that 100% of the challenged bioaerosols were completely eliminated.

26.     Testing by a competitor of defendant's MH1 device contradicted defendant's claims about its efficacy and its PECO system.

27.     Defendant claimed its Product "[d]estroys 3.4 million black mold spores in 50 minutes."

28.     However, defendant has not disclosed crucial details of the tests that it relies on to substantiate these claims.

29.     Without details such as whether the PECO technology tested was the product as marketed for sale, the airflow rates, test chamber size, consumer relevance of the chamber size, etc., defendant's testing cannot prove the challenged quantified claims that the Product completely eliminates all airborne mold, allergens, viruses, bacteria, etc., in a matter of minutes.

B.  VOC Elimination Claims

30.     Volatile Organic Compounds (VOCs) are defined by EPA regulation as "any compound of carbon, excluding carbon monoxide, carbon dioxide, carbonic acid, metallic carbides or carbonates, and ammonium carbonate, which participates in atmospheric photochemical reactions."

31.     According to defendant, "these gaseous pollutants can be harmful to everyone, especially if you have asthma or chemical sensitivity."

32.     Defendant promotes the ability of its Products to eliminate VOCs, stating that, "Independent lab results have shown that PECO destroys VOCs quickly and efficiently."

6

33.     Since this claim touts the Products' performance, it is necessary to have testing on the actual product to back up this claim.

34.     Moreover, the testing should mirror typical usage conditions.

35.     Defendant's tests in support of its VOC claims are flawed for several reasons.

36.     First, the tests were not conducted by independent labs.

37.     Several of defendant's tests were conducted in association with the University of Minnesota in 2015 and 2016.

38.     While the reports were published on University of Minnesota letterhead, they indicate that the device was tested at the University of South Florida's ("USF") Clean Energy Research Center ("CRC").

39.     Defendant's founder and Molekule inventor, Dr. Yogi Goswami, is the director of the CRC, which draws into question the independent nature of this study.

40.     Additionally, defendant is sponsor of the Particle Calibration Laboratory at the University of Minnesota's College of Science and Engineering, which further undermines the independence of the studies.

41.     These facts contradict defendant's claims that its tests are independent.

42.     Second, the tests were not conducted under consumer relevant conditions.

43.     The 2015 University of Minnesota study did not test the actual product, but a larger model that was never sold.

44.     Further, the test chamber again was small and not representative of an actual room.

45.     Even accepting these facts, they cannot be extrapolated to evaluate the claims concerning the elimination of VOCs in a large room.

46.     The results suggest that the Product tested could take more than 75 hours to clean a

large room, if it could do so at all.

47.    Defendant's 2018 Intertek Study also used a small test chamber, such that even if the results were accurate, they do not represent the performance of the device in an average sized room.

48.    Moreover, the device took a long time for the device to remove the challenged VOCs.

49.    The three VOCs – formaldehyde, toluene, and D-limonene – only fell to below detectable levels at 4 hours, 1 hour, and 45 minutes, respectively.

50.    However, there was no control for natural decay so that the results could be compared to the amount of VOCs that would leave the air if a filter were not present.

51.    These test results do not show test that the device can clean a full-size room.

52.    Third, the test results do not support the challenged claims.

53.    Defendant's 2016 University of Minnesota Study purported to show that its PECO technology could reduce the concentration of an acetone (VOC) challenge "to near background levels within 6 hours."

54.    However, this study failed to test the actual product but instead tested a scaled-up version of defendant's PECO technology with a very small chamber.

55.    Though the acetone concentration in the chamber dropped after six hours, it was still three times higher than the reported background VOC concentration.

56.    Therefore, the claim that that acetone would be "near background levels within 6 hours" was false, deceptive, and misleading.

57.    These test results further indicate that the device is likely not capable of cleaning, or having any effect on, the air in an actual, full-size room.

58.    As with the 2015 study, the test results showed that the device can clean (or have any

8

effect on) the air in an actual full-size room.

59.     Consumer Reports concluded that:

> Theoretically, PECO could work to eliminate microscopic airborne molecules, Dickerson says. But our tests show that the Molekule Air is not proficient at catching larger airborne particles, which ultimately means it's not getting enough air passing through the system.

## II.    SUPERIORITY CLAIMS

60.     Defendant's advertising promotes its PECO technology as superior to HEPA-filter technology.

61.     HEPA filters have been used in home and office air purifiers for many years and date back to the World War II.

62.     The two technologies act differently to remove pollutants from a room. Stated simply,

63.     HEPA filters trap impurities as they pass through the filter, while filters based on PECO technology are claimed to destroy, rather than trap, the impurities.

64.     The two systems also differ with respect to volatile organic compounds ("VOCs").

65.     Defendant claims its PECO-based air purifiers are superior to the HEPA-based devices, through the following statements, which were disseminated in digital and/or print media, social media, and/or defendant's website:

- "Finally, an air purifier that actually works. Until now, air purifiers have attempted to collect pollutants on filters where they can multiply and be released back into the air."

- "HEPA filters can't trap small pollutants. Many harmful pollutants such as VOCs are smaller than 0.3 microns. HEPA filters can't remove them."

- "[T]hings like mold and bacteria gather and grow in those HEPA fibers and escape

back into the air to continue to do you harm."

- "There's a clear winner in the fight against pollutants. Our scientifically-proven nanotechnology outperforms HEPA filters in every category of pollutant from well-known allergens like dust, pollen, and pet dander to microscopic pollutants like mold, viruses, bacteria, and gaseous chemicals."

- "By using nanotechnology, PECO is able to destroy pollutants 1000 times smaller than traditional HEPA filters (0.1 nanometers versus 300 nanometers)."

- "Unlike HEPA, PECO can eliminate pollutants at a microscopic scale (including VOCs and viruses), making Molekule the only product that eradicates the full spectrum of indoor air pollutants. These claims have been extensively tested by third party laboratories . . ."

- "Bacteria can easily stay alive on traditional HEPA filters. Studies have shown that bacteria can multiply on these filters and get released back into the air. Even if the bacteria dies, they can still release endotoxins into the air if not properly eliminated."

- "While HEPA filters can catch mold, they also become perfect places for mold growth. Eventually, this mold gets released back into the air."

- "Viruses are so small they can easily escape HEPA filters, but even if they are caught on the filter they can live for up to 200 days. PECO offers the first effective solution for managing the spread of airborne infectious diseases."

66.    None of these claims are supported.

67.    First, the HEPA-based products meet or exceed industry benchmarks for indoor air purifiers, contrary to defendant's claims.

68. Second, defendant's statements about HEPA filters are not accurate, and where they are accurate, they are misleading.

69. Third, defendant does not possess any scientific support for its superiority claims vis-à-vis HEPA filters.

70. Fourth, defendant's statements touting the abilities of the PECO technology are misleading, because even though defendant claims its underlying technology can do these things, its devices are unable to.

## III.   ALLERGY AND ASTHMA RELIEF CLAIMS

71. In its marketing and advertising across digital, print, and/or social media, and on its website, Defendant claims that the Products can reduce the incidence and severity of allergies and asthma, by stating:

- "The science is in. Molekule makes strides in providing empirical evidence for what PECO technology can really do. 2018 sees a study published in Allergy & Rhinology featuring 46 allergy sufferers and their results after using Molekule."

- "Real people. Real proof. Our beta trial was conducted on 28 participants including asthma and allergy sufferers. After using Molekule, there was no difference in total symptom scope between allergy and non-allergy sufferers. Results point to the potential for Molekule to immediately improve allergy sufferers['] quality of life."

- "Our scientifically proven nanotechnology outperforms HEPA filters in every category of pollutant from well-known allergens like dust, pollen, and pet dander to microscopic pollutants like mold…";

- Molekule's superior performance versus HEPA on a microscopic scale "have been extensively tested by third party laboratories…"

72. These claims were and are made through defendant's website, molekule.com, and in digital and/or print advertising and testimonials on social media including YouTube and Facebook.

73. These types of claims promise consumers that there is scientific evidence that proves or "establishes" the truth of its claims ("establishment claims").

74. Competent and reliable scientific evidence includes, tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results.

75. For health-related claims, this evidence should consist of methodologically sound human clinical studies that are statistically significant to the 95% confidence level, with results that translate into meaningful benefits for consumers that relate directly to the performance attributes promised by the advertising.

76. The features of a sound methodological study include:

- Clearly described objective;

- Appropriate methodology to obtain objectives posed by the study;

- Sufficient duration to detect an effect on the outcome;

- Large enough sample size to provide sufficient statistical power;

- Subject population should be representative of the target population to which the claim is targeted; and

- Outcome of study should achieve statistical significance as against the placebo group.

12

77. Defendant conducted two human studies – the Beta Trial and Expanded Study.

78. Twenty-eight participants completed the Beta Trial and forty-six completed the Expanded Study.

79. Both studies relied on self-reporting of symptoms.

80. The Beta Trial tested a mix of people with and without self-reported allergies.

81. The Expanded Study tested those with self-reported allergies.

82. The Beta Trial concluded that the Molekule device was effective because the symptom levels of allergy sufferers converged with the symptom levels of non-allergy sufferers.

83. The Beta Trial's results were not unequivocal, stating that its results "point to the *potential* for Molekule to immediately improve the quality of life for those who suffer from allergies." (emphasis added).

84. The Expanded Study:

> found significant and sustained improvements in respiratory allergy symptoms within a week of using portable air filtration using PECO technology. Improvements were also noted in sleep quality. There was a benefit after 1-week use which was sustained for the entire 4-week use of the air purifier.

85. Defendant failed to disclose relevant information to evaluate its studies.

86. No data was provided on how the study population was recruited to insure it was a representative population.

87. The small sample size was insufficient to support the sweeping claims of allergy and asthma relief.

88. No evidence was provided that the test's duration was sufficient to evaluate allergy relief.

89. The studies were not "blinded," which increased the potential for bias given that the

test relied entirely on self-reported symptoms.

90.   Moreover, the main author of the studies was defendant's employee.

91.   Therefore, defendant's claims about allergy and symptom relief which relied upon their proof and referenced their studies were unsupported, rendering these claims false and misleading.

92.   Defendant also made these claims through consumer and physician testimonials disseminated through its website, social media, and advertising.

93.   Testimonials can be misleading even where it is based on the honest opinion of the endorser if there is no scientific evidence to back up the underlying claim.

94.   Defendant's consumer testimonials told potential consumers that:

- nothing else worked for their allergy symptoms (including other filters) before trying Molekule;

- they were able to stop using an inhaler for asthma;

- that Molekule made their allergies better overall;

- and that due to Molekule, there was a noticeable difference in allergy symptoms, wherever the person was, whether inside or outside;

- the air quality improvement was "fairly instant";

- Molekule even improves pets' allergy symptoms;

- Because of Molekule, users no longer wake up with a stuffy nose, wake up clear-headed, sleep better at night and rarely get sick.

95.   Another user (a participant in the Beta Trial), stated that both she and her son had allergies, asthma, and eczema.

96.   After using the Product, the mother no longer woke up several times in the night

14

hearing her son breathing hard or coughing to the point where she had to go to him and place the nebulizer over his face or use the inhalers.

97.    Both her and her son's symptoms improved such that they were able to get a dog, and her son was now involved in karate and able to run around and wrestle, just like a normal kid.

98.    Despite this anecdotal evidence, no competent scientific evidence supports the claims made through these testimonials.

99.    Defendant uses doctors in testimonials as well.

100.   In one, Dr. Chris Tashjian, a general practitioner, stated that he was able to stop using antihistamines.

101.   Dr. Eric Gordon, a specialist in chronic complex illnesses, stated his clinic used a few different air filters without any effect.

102.   However, after the Molekule unit was running in his clinic for a few minutes, "people actually started to feel better, the air quality changed that rapidly."

103.   Dr. Gordon added that the Molekule "really lowered the level of allergens in the environment and it allowed people to breathe better and not have as many headaches, and sometimes prevent[ed] some of the neurologic symptoms for the people who are sensitive to the mold microtoxins….it really got rid of a lot of their symptoms."

104.   Further, when he loaned the Molekule unit out to his really sensitive employees, they noticed a big improvement in their symptoms, and he claimed that these were people who were not "placebo responders."

105.   Advertisements that include claims concerning the opinions of medical professionals carry significant weight with consumers.

106.   However, merely because an opinion is from a medical professional does not obviate

the need to possess competent and reliable scientific evidence, which was lacking.

107.   Defendant's claims that its device was proven to achieve the relief promised is false, deceptive, and misleading.

## IV.   CONCLUSION

108.   Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of the Product, relative to itself and other comparable products or alternatives.

109.   The value of the Products that plaintiff purchased was materially less than its value as represented by defendant.

110.   Defendant sold more of the Products and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

111.   Had Plaintiff and proposed class members known the truth, they would not have bought the Products or would have paid less for it.

112.   The Products is sold for a price premium compared to other similar products, no less than between $250 to over $1,000, for the range of models, higher prices than they would otherwise be sold for, absent the misleading representations and omissions.

<u>Jurisdiction and Venue</u>

113.   Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

114.   The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

115.   Plaintiff Barbara Sobel is a citizen of New York.

116.   Defendant Molekule, Inc. is a Delaware corporation with a principal place of

business in San Francisco, San Francisco County, California

117.   The parties are citizens of different states.

118.   Venue is in this district because plaintiff resides in this district and the actions giving rise to the claims occurred within this district.

Parties

119.   Plaintiff Barbara Sobel is a citizen of Forest Hills, Queens County, New York.

120.   Defendant Molekule, Inc., is a Delaware corporation with a principal place of business in San Francisco, California, San Francisco County.

121.   Defendant is a relatively new entrant to the air purifier market that has made significant headway with consumers.

122.   Defendant's Products were initially only available from its website.

123.   However, retail stores, like consumer electronics retailer Best Buy, sell the Products directly to consumers.

124.   Plaintiff bought the Product – the Molekule Air –within the statutes of limitations for each cause of action alleged, at Best Buy, 8801 Queens Blvd, Queens, NY 11373, in late 2019 or 2020.

125.   Defendant's advertisements and marketing are or were pervasive and did not specifically or conspicuously indicate which, if any, model they applied to.

126.   Defendant's claims are not device-specific, as they tout the ability of their PECO technology, included in all of defendant's models.

127.   A consumer, like plaintiff, who saw the Molekule claims, expected they would apply to the version of the Molekule she purchased.

128.   Plaintiff is not a scientist or investigative journalist or a product reviewer and could

not have known the Product could not accomplish what it promised.

129.   Plaintiff observed and relied on defendant's claims related to quantified pollution, superiority compared to HEPA products, and the ability to provide allergy and asthma relief, among other claim types.

130.   Plaintiff is an allergy sufferer and expected the Molekule product she bought would reduce her allergies.

131.   Plaintiff viewed the testimonials and advertisements related to the Product's effect on reducing symptoms of allergies.

132.   Plaintiff viewed the marketing and advertising claims on social and digital media, on third-party websites, and/or on defendant's website.

133.   Plaintiff bought the Products – the Molekule Air – which has a retail price of $699.

134.   Plaintiff relied on the representations identified here.

135.   Plaintiff would not have purchased the Product if she knew the representations were false and misleading.

136.   Plaintiff chose between Defendant's Products and other similar products which were represented similarly, but which did not misrepresent their attributes and/or lower-priced products which did not make the claims made by Defendant.

137.   The Products were worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

138.   Plaintiff intends to, seeks to, and will purchase the Products again when she can do so with the assurance that Products' representations are consistent with their performance.

## Class Allegations

139.  Plaintiff seeks certification under Fed. R. Civ. P. 23(b)(2) and (b)(3) of the following classes:

> **New York Class:** All persons in the State of New York who purchased the Product during the statutes of limitations for each cause of action alleged.

> **Consumer Fraud Multi-State Class:** All persons in the States of Iowa and Arkansas who purchased the Products during the statutes of limitations for each cause of action alleged.[2]

140.  Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

141.  Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

142.  Plaintiff is an adequate representative because her interests do not conflict with other members.

143.  No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

144.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

145.  Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

146.  Plaintiff seeks class-wide injunctive relief because the practices continue.

---

[2] The States in the Consumer Fraud Multi-State Class are limited to those States with similar consumer fraud laws under the facts of this case: Iowa (Consumer Fraud and Private Right of Action for Consumer Frauds Act, Iowa Code Ann. § 714.16 et seq.); Arkansas (Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, et. seq.).

New York General Business Law ("GBL") §§ 349 & 350

(Consumer Protection Statute)

147.   Plaintiff incorporates by reference all preceding paragraphs.

148.   Plaintiff and class members desired to purchase a product that achieve the quantified pollution reduction promised, used superior technology to other air purifiers, and alleviated allergies and asthma.

149.   Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

150.   Defendant misrepresented the Products through statements, omissions, ambiguities, half-truths and/or actions.

151.   Plaintiff relied on the representations.

152.   Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts

(On Behalf of the Consumer Fraud Multi-State Class)

153.   The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

154.   Defendant intended that plaintiff and each of the other members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

155.   As a result of defendant's use or employment of artifice, unfair or deceptive acts or business practices, plaintiff, and each of the other members of the Consumer Fraud Multi-State Class, have sustained damages in an amount to be proven at trial.

20

156.   In addition, defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

157.   The Products was manufactured, labeled, and sold by defendant and expressly and impliedly warranted to plaintiff and class members that it did not contain achieve the quantified pollution reduction promised, used superior technology to other air purifiers, and alleviated allergies and asthma.

158.   Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Products.

159.   This duty is based on Defendant's outsized role in the market for this type of Products.

160.   Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers, and their employees.

161.   Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, and consumers, to its main offices.

162.   The Products did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable because they were not fit to pass in the trade as advertised.

163.   Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

164.   Defendant had a duty to truthfully represent the Products, which it breached.

165.   This duty is based on defendant's position, holding itself out as having special

knowledge and experience this area, as a self-proclaimed science and technology company, located in Silicon Valley, home to many of the important innovations in computers and electronics.

166.   The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant, a nationally recognized and trusted brand.

167.   Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Products.

168.   Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

Fraud

169.   Defendant misrepresented and/or omitted the attributes and qualities of the Products, that it did not have achieve the quantified pollution reduction promised, used superior technology to other air purifiers, and alleviated allergies and asthma

170.   Defendant's fraudulent intent is evinced by its knowledge that the Products were not consistent with its representations.

Unjust Enrichment

171.   Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

 **WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   September 5, 2021

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
60 Cuttermill Rd Ste 409
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com